IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:02CV00862

| | | |
|---|---|---|
| ELI BROWN, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENTWITH INCORPORATED** |
| MICHAEL C. FLOWERS, a/k/a | ) | **MEMORANDUM OF LAW IN** |
| "MIKE CITY," | ) | **SUPPORT THEREOF** |
| | ) | |
| Defendant. | ) | |

**NOW COMES** the Defendant, Michael C. Flowers, by and through his undersigned counsel of record, and pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP"), moves the Court for summary judgment as there is no genuine issue as to any material facts and the Defendant is entitled to summary judgment as a matter of law as shown by the Memorandum of Law incorporated herein, and as further supported by the Declaration of Michael C. Flowers attached hereto.

In support thereof, the Defendant submits the following:

**MEMORANDUM OF LAW**

I.  **INTRODUCTION.**

A.  **Statement of the Matter before the Court.**

Plaintiff Eli Brown ("Brown") alleges that Defendant Michael C. Flowers ("Flowers") "misappropriated" two songs that Brown Claims are partnership property. At the outset of this action, Defendant filed a motion pursuant to FRCP Rule 12(b)(6) seeking dismissal of plaintiff's claims pursuant to the Copyright Act. On December 12, 2003, this Court granted Defendant's motion and ruled as follows:

1

"[The] Complaint fails to allege any facts from which one could infer that the agreement to incorporate the Hectic Records partnership addressed any assignment of copyrights from Mr. Flowers to Mr. Brown. Further, a review of the written agreement itself confirms that the agreement makes no mention of any copyright ownership, or of any transfer of copyright ownership. Because Mr. Brown has not sufficiently alleged that he was an original owner of the songs in question, or that Mr. Flowers transferred any rights to him. Mr. Flowers' Motion to Dismiss is GRANTED." (Memo. Opinion., p. 12-13).

What remains of this action are state law claims for breach of oral contract, partnership accounting, fraudulent concealment, negligent misrepresentation, breach of fiduciary duties and unfair or deceptive trade practice.

Flowers files this motion for summary judgment seeking dismissal of each of the state claims.

### B.  <u>Statement of Facts</u>.

Brown's vague and unenforceable purported agreement, that is the basis for each of the claims for relief, is set forth in paragraph 6 of the Complaint:

"Brown and Flowers entered into a partnership agreement in late 1994 or early 1995 (hereafter known as "Hectic Records partnership") whereby they agreed to work together in pursuit of several goals, including by way of illustration and not limitation, the following: to produce musical recordings for potential sale for general distributors; to secure contracts for regular general distribution of their music; to provide recording and engineering services for other artists; to secure contracts for the regular provision of recording and engineering services for other artists; to conduct marketing and promotional efforts in the music industry; and to engage in other business activities designed to further the Hectic Records partnership in the music industry."

Around August, 1996, Brown and Flowers entered into an oral agreement to form a record company called Hectic Records. Brown and Flowers later entered into a written agreement that attempted to reduce to writing the parties' intent with respect to Hectic Records. A true and correct copy of the agreement is attached to Flowers' Declaration as Exhibit 2. Hectic Records released two (2) albums. Musical compositions written by

2

Flowers and production services rendered by Flowers to third parties were not assets or services transferred by Flowers to the Hectic Records partnership.

The essence of plaintiff's claim is simple. Plaintiff alleges an agreement with plaintiff in which "they agreed to an equal division of all profits from their activities in creating and marketing *musical recordings made in the Durham recording studio of Brown.*" (Complaint, ¶ 30.) (Emphasis added.) Defendant allegedly breached the purported agreement by failing to share with plaintiff "50% of monies earned by Flowers using music produced in Brown's Durham recording studio pursuant to the Hectic Records partnership agreement ...."

## II.   QUESTIONS PRESENTED.

Pursuant to Local Rule 7.2(a)(3), Flowers sets for the following questions presented:

1.   Whether there was a contract other than the Hectic Records partnership to sell music under the "Hectic Records" label.

2.   Whether the Hectic Records oral partnership was terminated.

3.   Whether the parties entered into an oral agreement that included Flowers' services to third parties as a record producer.

4.   Whether the purported oral agreement is void and unenforceable pursuant to N.C.G.S. § 75-4.

5.   Whether any genuine issue of material fact exists as to Brown's claim for fraudulent concealment.

6.   Whether any genuine issue of material fact exists as to Brown's claim for negligent misrepresentation.

7.     Whether any genuine issue of material fact exists as to Brown's claim for breach of fiduciary duties.

8.     Whether any genuine issue of material fact exists as to Brown's claim for unfair and deceptive trade practices.

## III.    ARGUMENT.

### A.    Standard for Motion for Summary Judgment.

Summary judgment should be granted upon demonstration that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." FRCP 56(ccc); *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 250 (1986). The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc. supra*, 477 U.S. at 256. The movant may meet this burden by showing a lack of evidence to support the non-movant's claim on a material issue on which the non-movant has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-moving party then must meet a burden of coming forward with specific facts showing that there is a genuine issue for trial, by a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett, supra*, 477 U.S. at 322. The non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts or make conclusory allegations in an attempt to manufacture issues of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*. 475 U.S. 574, 585 (1986). Conclusory allegations, conjecture and speculation will not create a genuine issue of fact. *Kerzer v. Kingly Manufacturing*, 156 F.3d 396, 400 (2nd Cir. 1998). The non-movant must put forth "specific facts

4

showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, supra, 477 U.S. at 256.

It is clear, given these standards, that Flowers is entitled to summary judgment dismissing all of Brown's remaining state claims.

## B. No Genuine Issue of Material Fact Exists as to Brown's Second Cause of Action for Breach of Contract.

There is no evidence of any agreement between the parties beyond the Hectic Records partnership. "To be enforceable, the terms of a contract must be sufficiently definite and certain." *Lemley v. Colvard Oil Co.* 577 S.E.2d 712, 715 (2003) The Complaint alleges as follows:

> "The parties entered into the Hectic Records partnership agreement whereby they agreed to an equal division of all profits from their activities in creating and marketing *musical recordings* made in the Durham recording studio of Brown ...." (Complaint, ¶ 30.) (Emphasis added.).

There is no evidence that Flowers marketed any *musical recordings* that Brown purports to have an interest in. In fact, Flowers never took possession of any original tapes, thereby making it impossible to market any such recordings. (Flowers Decl., ¶¶ 11-13.)

The only possible theory of recovery that can be gleaned from the complaint is the notion that Flowers somehow exploited partnership assets to the detriment of the Hectic Records partnership. The problem with this theory is that it has no basis in fact. Unless Brown can present evidence that Flowers used *recordings* (not musical compositions) made in the Durham studio, to make new recordings for other artists, summary judgment must be granted. The Declaration of Flowers demonstrates that no recordings made in the Durham studio were used for subsequently released commercial recordings. (Flowers Decl., ¶¶ 11-13.) This Court's Rule 12 (b)(6) ruling in the Memorandum Opinion dated December 12, 2003, in Defendant's favor, precludes the Court from finding a contract

concerning the *intangible property* (musical compositions), and there has been no showing that Flowers used, or even possessed, *tangible property* (in the form of recordings) from the Durham studio, upon which an ongoing contractual obligation can be based.

### 1.    There Was No Agreement Beyond Hectic Records.

An essential element of every contract is mutuality of agreement. In other words, the parties must assent to the same thing in the same sense, and their minds must meet as to all terms, resulting in a "meeting of the minds." *Fulk v. Piedmont Music Center*, 138 N.C. App. 425, 531 S.E.2d 476 (2000). There is no evidence that the parties agreed to much beyond releasing two CD's on the Hectic Records label. (Flowers Decl., ¶¶ 11-13.)

Some time in August, 1996, distributor Ichiban Records offered Flowers a distribution deal. At that time Flowers was not interested in doing such a deal, but did so at the urging of Brown, who wanted to be Flowers' partner in connection with a record label. Flowers signed a distribution agreement for Ichiban Records to distribute Hectic Records. Flowers signed the agreement on behalf of himself, doing business as Hectic Records. Part of the reason that Flowers agreed to start the record company was Brown's promises to provide funds for marketing and promoting the records that Flowers was to produce. (Flowers Decl., ¶ 5.)(Hectic Records "agreement" signed on October 2, 1997 (Flowers Decl., Exhibit 2)). The oral agreement was simple. With respect to records released on the Hectic Records label, Brown and Flowers agreed to share revenues from sales of records equally. (Flowers Decl., ¶ 6.)

In 1997, Brown and Flowers released two (2) albums on the Hectic Records label. One album was entitled "Mike City Presents The N.C. All Star Project Vol. 1". The second album was entitled "Lost Souls - Soul Talk". Neither of these albums was a

6

commercial success by any definition. During the entire time Hectic Records operated, Flowers was a college student and Brown worked in the construction business as a developer. (Flowers Decl., ¶ 7.)

Although Brown served as Flowers' personal manager from 1989 through 1992, Brown was *not* Flowers' personal manager in 1997 or any time thereafter. Pursuant to that agreement, Brown was entitled to a percentage of "any and all gross monies or other consideration which [Flowers] earn[s] *during the term hereof* as a result of my activities in and throughout the entertainment, amusement, music, recording and literary fields." (Flowers Decl., Exhibit 1). The personal management agreement had long expired. By this lawsuit, Brown is improperly attempting to revive the personal management agreement and collect revenue that he is not entitled to collect.

### 2. The Hectic Records Partnership Was Terminated.

N.C.G.L. § 59-59 provides that "[t]he dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." Dissolution is caused "[b]y the express will of any partner when no definite term or particular undertaking is specified." N.C.G.L. § 59-61.

In August of 1999, Flowers moved to New Jersey and told Brown that he no longer wanted to continue the Hectic Records partnership. (Flowers Decl., ¶ 9) At that point in time, the Hectic Records partnership ceased to exist.

### 3. Any Agreement That Restricts A Party's Legal Right To Do Business Must Be In Writing.

The purported oral agreement alleged in the Complaint is unenforceable as a matter of law. Paragraph 6 of the Complaint (set forth above), alleges an oral agreement

7

that restricts Flowers' ability to do business without Brown. Significantly, Brown does not allege that either he or Brown agreed to provide any services exclusively to the Hectic Records partnership. North Carolina General Statutes § 75-4 provides in relevant part as follows:

> "No contract or agreement hereafter made, limiting the rights of any person to do business anywhere in the State of North Carolina shall be enforceable unless such agreement is in writing duly signed by the party who agrees not to enter into any such business within such territory...."

The purported oral agreement set forth in paragraph 6 of the Complaint, on its face, is void and unenforceable under § 75-4.

In *Radio Electronics Co. v. Radio Corp. of Am*, 244 N.C. 114, 92 S.E..2d 664 (1956) the court held that an oral contract which prohibits defendant's right to do business except through plaintiff as its exclusive distributor, limits substantially defendant's right to do business, therefore , under § 75-4, the agreement is void and unenforceable.

"Ultimately, the determination of whether an act or practice is an unfair or deceptive practice is a question for the court." *Lake Mary Ltd. Partnership v. Johnston*, 551 S.E.2d 546 (N.C. Ct. App. 2001).

## C. No Genuine Issue of Material Fact Exists as to Brown's Third Cause of Action for Partnership Accounting.

Brown alleges that he is entitled to "an accounting by Flowers of all profits derived from Flowers' misappropriation of Hectic Records partnership assets, to wit, all music originally recorded in Brown's Durham studio pursuant to the Hectic Records partnership agreement...." (Complaint, ¶ 41.) Obviously, if no partnership exists, there is no basis for a partnership accounting. Moreover, at no time did Flowers misappropriate any Hectic Records partnership assets. (Flowers Decl., ¶ 10.)

8

### D.    No Genuine Issue of Material Fact Exists as to Brown's Fourth Cause of Action for Fraudulent Concealment.

Brown alleges that "Flowers was surreptitiously taking music recorded for the benefit of the Hectic Records partnership and presenting the same to third parties as his own work, receiving substantial monetary compensation for the same without disclosing his activities to Brown." (Complaint, ¶ 45.)  Flowers did not take any Hectic Records music.  (Flowers Decl., ¶ 10-13)  Furthermore, any compensation Flowers received in connection with the recordings at issue, "I Wish" and "Lunch or Dinner?", was fees for his services as a record producer, not payment for any recordings made at Brown's studio. (Flowers Decl., ¶ 10.)

### E.    No Genuine Issue of Material Fact Exists as to Brown's Alternative Fourth Cause of Action for Negligent Misrepresentation.

Brown alleges that Flowers' concealment of "his negotiations with third parties, resulted from negligent or reckless disregard by Flowers of his duties to his partner, Brown..." Because there is no evidence of any negotiations that related to the Hectic Records partnership, there can be no duty to disclose such negotiations.

### F.    No Genuine Issue of Material Fact Exists as to Brown's Fifth Cause of Action for Breach of Fiduciary Duties.

The Complaint alleges that Flowers breached his fiduciary duty to Brown "[b]y selling music recorded at Brown's Durham recording studio pursuant to the Hectic Records partnership agreement without properly accounting to Brown...." (Complaint, ¶ 55.)  As a matter of law, there is no breach of fiduciary duty.  First, Flowers did not sell any music recorded at Brown's studio.  Second, because there was no oral partnership with respect to Flower's activities as a record producer, there is no fiduciary duty.

9

**G.** **No Genuine Issue of Material Fact Exists as to Brown's Sixth Cause of**

**Action for Unfair or Deceptive Trade Practices.**

To establish a statutory claim for unfair or deceptive trade practices, a claimant

must show: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, (3)

which proximately caused actual injury to the claimant. *Rawls & Associates v. Hurst*,

144 N.C. App. 286, 550 S.E.2d 219 (2001)

"A mere breach of contract, even if intentional, is not an unfair competition or

deceptive act under G.S. § 75-1.1." *Jones v. Capitol Broadcasting Co.*, Inc. 495 S.E.2d

172 (N.C. App. 1998).

**WHEREFORE,** for the above stated reasons, Defendant Flowers prays the court

grant the motion for summary judgment, and for an order dismissing the action against

him.

This the 3rd day of December, 2004.

Stephen E. Robertson
Attorney for Defendant
State Bar No. 27608
400 W. Market Street, Suite 501
Greensboro, NC 27401

Reginald K. Brown
Attorney for Defendant
*Admitted pro hac vice*
6080 Center Drive, 6th Floor
Los Angeles, CA 90045

## CERTIFICATE OF SERVICE

I, the undersigned, certify that a copy of the foregoing MOTION FOR

SUMMARY JUDGMENTWITH INCORPORATED MEMORANDUM OF LAW IN

SUPPORT THEREOF has been served upon the following individual by facsimile

transmission and deposit in the United States Mail, postage prepaid, and addressed as

follows:

>Thomas H. Stark
>Stark Law Group, PLLC
>5925 Farrington Road, Suite 200
>Chapel Hill, NC 27517
>Facsimile (919) 490-5551

This the 3rd day of December, 2004.

_____
Stephen E. Robertson

## DECLARATION OF MICHAEL C. FLOWERS

I, Michael C. Flowers, declare and state:

1.       I am a defendant in this action and submit this declaration in support of my motion for summary judgment. I am professionally known as "Mike City."

2.       I am a musician, songwriter and a record producer known in the music business as "Mike City". I studied music and majored in voice at North Carolina Central University.

3.       I met Eli Brown ("Brown") in either 1988 or 1989 while I was a college student. At that time he began managing a band I belonged to. On or about May 6, 1989, we entered into a written three (3) year personal management agreement. A true and correct copy of the personal management agreement is attached hereto as Exhibit "1".

4.       The personal management agreement expired in 1992. After the expiration of the personal management agreement we did not speak for several years. During that period of time I had developed as a songwriter and record producer and had begun writing and producing for several recording artists in North Carolina. One of the groups I produced was a group known as "Psychorhythmologists" who recorded for Giant/Warner Bros. Records.

5.       Some time in August, 1996, distributor Ichiban Records ("Ichiban") offered a distribution deal for a record label I was thinking about starting. At that time I was not really interested in doing such a deal, but I did so at the urging of Brown, who wanted to partner with me in a record company. I signed a distribution agreement for Ichiban Records to distribute Hectic Records. I signed the agreement on behalf of myself, doing business as Hectic Records. Part of the reason that I agreed to start the

1

record company was Brown's promises to provide funds for marketing and promoting the records that I was to produce. Soon after I signed a distribution agreement with Ichiban, Brown and I orally agreed to form Hectic Records.

6.    On or about October 2, 1997, Brown and I signed an agreement to incorporate Hectic. A true and correct copy of the agreement is attached hereto as Exhibit "2". Our Oral agreement was simple. With respect to records released on the Hectic Records label, we agreement to share revenues from sales of records equally. Hectic Records was formed for the purpose of releasing records and no other reason. During the entire time Hectic Records operated, I was a licensed barber and Brown was in the construction business as a developer.

7.    In 1997, Brown and I release two albums on the Hectic Records label. One album Was entitled "Mike City Presents The N.C. All Star Project Vol. 1". The second album was entitled "Lost Souls - Soul Talk". Neither of these albums was a commercial success by any definition. One of the primary reasons these records did not succeed was because Brown did not provide the funds for marketing and promotion that he promised.

8.    In addition to the one Hectic Records agreement, we had an informal understanding that I, as a songwriter and producer, would help Brown with some of the recording artists Brown was developing in exchange for having occasional non-exclusive access to his home recording studio to work on my own projects. These recording artists were separate from Hectic Records. For example, I produced a vocal group called "Homemade Brigade" that included his nephew as a member. I did not ask for nor did I expect any compensation for this production work. Brown also worked with an R&B

2

group called "Simple Pleasure" and a gospel group as well. I had nothing to do with these groups . I never asked for or expected an ownership interest in any of his projects.

9.    In August, 1999 I left North Carolina and I told Brown that I was no longer interested in pursuing the Hectic Records label. I moved to New Jersey. Soon thereafter I moved to Los Angeles. I moved to Los Angeles because I was serious about making a name for myself as a songwriter and record producer. Once I moved to Los Angeles, good things started to happen. I had a conversation with Brown after I moved to Los Angeles and asked him if he was willing to move to Los Angeles to pursue his music business dreams. He told me that because of his family obligations to his wife and children, he could not.

10.    With respect to the recording entitled "I Wish", recorded by Carl Thomas, Brown alleges that "[w]ith only a bridge added to the original Durham recording, the song was recorded and included in an album..." I did not use any recordings made in Brown's studio to record "I Wish". The fact that a bridge was added to the recording that was commercially released makes it impossible to have used any recordings made in Brown's studio. I did not "sell" any music in connection with this recording. I was hired to render services as a record producer. I have never "misappropriated" any assets of the Hectic Records partnership.

11.    With respect to the recording entitled "Lunch or Dinner?", recorded by Sunshine Anderson, Brown alleges that the song was "originally engineered in Brown's Durham recording studio". As with "I Wish", no recordings made in Brown's studio were used to make "Lunch or Dinner?". In fact, the original song demonstration recordings ("demos") were recorded in a different key than the key Sunshine Anderson

3

ultimately used. For me to have used a recording from Brown's studio to record "Lunch or Dinner?", the commercially released version would have had to be in the same key as the demo. I did not "sell" any music in connection with this recording. I was hired to render services as a record producer.

12.     The fees I received for producing Carl Thomas and Sunshine Anderson were fees for my services, not fees paid in exchange for recordings created at Brown's studio.

13.     When I lived in North Carolina, I created musical compositions at my home using an Ensonic ASR 10 keyboard, which had a MIDI (musical instrument digital interface) capability, allowing for digital storage of music data. At that time, Brown has an Ensonic ASR keyboard at his studio as well. In order to record my compositions and add vocals, I would take the data (on a disc) from my keyboard to Brown's studio and transfer it to his keyboard in order to record the songs using ADAT recording technology. ADAT is a eight (8) track recording process using standard super VHS video tapes to make audio recordings. When I finished the ADAT tracks they remained at Brown's studio. I never removed any ADAT tracks from Brown's studio.

14.     While ADAT technology is an excellent format for song demos or "rap" music, it is not the preferred technology for music industry professionals who record R&B and "pop" records. Since I left North Carolina I stopped using the ADAT format. All of my recording projects are done using 24 track two inch analog tape, pro-tools, or Tascam DA-88.

15.     On each of the new recordings that are the subject of this lawsuit,

4

engineers other than Brown were hired to record (capture to sounds onto tape) as well as "mix" (blending of the various individual tracks such as drums, keyboard sounds, guitars, horns, etc. with the addition of standard effects such as reverb and other manipulation of sound.) None of the services Brown may have provided as an engineer on any demo recordings were used on any Sunshine Anderson or Carl Thomas recordings.

16. I declare under penalty of perjury under the laws of the United States, that the foregoing is true and correct and based on personal knowledge, except for those matters stated on information and belief, and as to those matters, I am informed and believe them to be true.

Executed this 2nd day of December, 2004, at Los Angeles, California.

MICHAEL C. FLOWERS

5

# EXHIBIT 1

# East End Studio
## &
## Production Company

Dear MR. ELI BROWN :

    This letter will set forth our agreement as follows:

    1.   (a)  <u>ENGAGEMENT AND TERM</u>:  I, <u>MICHAEL FLOWERS</u>, desire to obtain your advice, counsel and direction in the development and enhancement of my professional career.  In view of the foregoing, I hereby engage you as my sole and exclusive personal manager in the entertainment, amusement, music, recording and literary fields, throughout the world, for the term of three (3) years years commencing MAY 6 , 19 89 under the terms and conditions hereinafter set forth.

    2.  <u>SERVICES</u>:  You accept said employment and agree subject to my availability and cooperation:

    (a)  To advise and counsel me with respect to decisions concerning employment publicity, selection of literary, artistic and musical material, wardrobe, public relations and advertising, selection of theatrical and booking agencies and/or artist's agents and all other matters pertaining to my professional activities and career in the entertainment, amusement, music, recording and literary fields.

    (b)  To advise and counsel me with relation to the adoption of the proper format for presentation of my talents and in the determination of proper style, mood and setting in keeping with my talents and best interests.

(c)  To advise and counsel me with regard to general practices in the entertainment, amusement, music, recordings and literary fields, and with respect to compensation and terms of contracts related thereto.

(d)  To use your reasonable efforts to promote and enhance my professional reputation and standing.

(e)  To be available to me for consultation and rendition of services to me at all reasonable times.

3.  COMPENSATION:  Since the nature and extent of the success or failure of my career cannot be predetermined, it is my ddesire that your compensation be determined in such manner as will permit you to accept the risk of failure and likewise to benefit to the extent of my success. As compensation for your services, as hereinabove described, I agree to pay you, as and when received by me the following compensation:

(a)  A sum equal to ~~twenty~~ percent (20 %) of any and all gross monies or other consideration which I earn during the term hereof as a result of my activities in and throughout the entertainment, amusement, music, recording and literary fields.

(b)  The commission(s) set forth in Clause 3(a) above shall be based on the gross monies or other considerations which I earn and receive from all applicable engagements, contracts, and agreements pursuant to the terms set forth in said engagements, contracts, and agreements or agreed upon prior to the expiration of the term hereof.  Consistent with the foregoing, you shall not commission any additional gross monies or other considerations which I earn and receive from any

improved terms of such engagements, contracts, and agreements if such improved terms are agreed upon subsequent to the expiration of the term hereof.

(c) You shall receive the foregoing compensation whether or not any employment, engagement, contract, agreement or other income producing activity shall have been procured by me as a result of your advice, consultation, or other efforts and whether or not the term of said employment, engagement, contract, agreement or income producing activity shall be effective or continue before, during or after the term of this Agreement, provided that I earn "gross monies or other considerations" with respect thereto during the time periods set forth in Clause 3(a) or 3(b) above.

4.  <u>AGENCY REPRESENTATION</u>:

(a) I shall at all time engage and utilize proper talent agencies and theatrical agents to obtain engagements and employment for me.  I understand that you are not a licensed talent agency and are not in the business of procuring employment or engagements.  Although you shall advise me concerning prospective employment or engagements, you are not obligated to and you shall not seek employment or engagements for me, nor do any of the acts of things done by talent agencies or theatrical agents.

(b) At such time as I may desire to engage a licensed talent agency to render services on my behalf, I agree to submit to you the name of such talent agency for your approval.  If you

shall disapprove any licensed talent agency whom I engage, and I shall nevertheless engage such licensed talent agency, you shall no longer be obligated to render your services to me hereunder; and in such event you may elect to treat this Agreement as terminated by me as of the date of such engagement in which event the term of this Agreement shall be deemed to be terminated as of the date thereof.

5. <u>INDEPENDENT ACTIVITIES</u>: You may have and maintain other interests of any kind, either of your own or in the activities or enterprises of others and you shall have the right to render your services to anyone else (including owners of productions of any kind in which services or other attributes are utilized) either in the capacity in which you are employed by me hereunder or otherwise.

6. <u>EXCLUSIVITY</u>: I agree not to employ during the term hereof any other person or entity to act for me in the capacity in which I have engaged you hereunder.

7. <u>CONSULTATION</u>: I shall refer to you all verbal or written leads, communications, or requests for the rendition of my services. I shall consult with you concerning each and every engagement, performance, booking or contract offered to me and I shall also consult with you regarding each engagement, performance, booking or contract that I accept.

8. <u>AUTHORITY</u>: You may, on my behalf, do the following: approve and permit any and all publicity and advertising; approve and permit the use of my name, photograph, likeness, voice, sound

effect, caricature, literary, artistic and musical materials for purposes of advertising and publicity and in the promotion and advertising of any and all products and services; execute for me in my name and/or in my behalf any and all agreements, documents, and contracts for my services, talents and/or artistic, literary and musical materials, provided I am unavailable to do the same on my own behalf, I have been apprised of the materials terms thereof and I have granted you the authority to execute such agreements in each specific instance;] collect and receive sums as well as endorse my name to all checks payable to me for my services, talents and literary and artistic materials and retain therefrom all sums owed to you. I shall refer to you all verbal or written leads, communications or requests for the rendition of my services in the entertainment, amusement, music, recording and literary fields.

9. <u>FURTHERANCE OF CAREER</u>: I agree at all times to devote myself to the furtherance of my career and to do all the things necessary and desirable to promote my career and earnings therefrom. I will not enter into any agreement or commitment which shall in any manner interfere with your carrying out the terms and conditions of this Agreement.

10. <u>Reformation</u>: In the event that there shall be any conflict between a provision of this Agreement and any applicable law or statute, the latter shall prevail. The provision or provisions of this Agreement affected thereby shall be modified to the extent (but only to the extent) necessary to remove such

remedy hereunder, shall be effective unless in writing signed by the party who is purported to be bound thereby or against whom such waiver or modification or amendment is asserted, and then only to the extent set forth in such writing. A failure to assert any right, term or condition under this Agreement shall not be deemed or construed to be a waiver of such right, term or condition for the future, or with respect to any subsequent breach thereof.

13. <u>Titles and Headings</u>: Titles and headings to sections hereof are for the purpose of reference only and shall in no way limit, define, or otherwise affect the provisions hereof.

14. <u>Governing Law</u>: This Agreement shall be governed by and construed and enforced pursuant to and in accordance with the laws of North Carolina.

If you agree to all of the terms contained herein, please so indicate by affixing your signature below in the space indicated.

*East End Studio*
*&*
*Production Company*

By:_____

Its:_____


AGREED AND ACCEPTED:

*Michael Flowers*

547-1/artist

MICHAEL FLOWERS
2312 OAKRIDGE BLVD.
DURHAM, NC 27707
490-6391
OR
3820 N. BROAD ST.
PHILA., PA 19140
1-215-226-839

# EXHIBIT 2

## Agreement between:
## Michael C. Flowers (Mike City) and Eli Brown (E) d.b.a. Hectic Records.

It is herby agreed:
1) The agreement in its enterity between Mike
   Flowers and Ichiban extends to the
   partnership of Eli Brown and Mike Flowers.

2) It is further agreed that the partnership has
   agreed to have the partnership incorporated and
   the entire agerement of the partnership will
   transfer to the new coropration.

3) It is also agreed that the new corporation will
   do business as Hectic Records Inc.

4) The distribution of stock will be as Follows:
   a) The initial issuing will be 500 shares of
      stock.
   b) Mike City will recieve 150 shares, Eli Brown
      will recieve 150 shares
   c) The remaining shares will be distributed as
      Follows:
      1) 100 shares in reserve.
      2) 100 shares to be made avaliable for
         sale.
      3) The price per share of the offered
         shares will be $1000 per share.
      4) All stock share initally will be common
         shares.


_Michael C. Flowers_     _10/2/97_
Michael Flowers (Mike City)     Date

_Eli Brown_     _10/2/97_
Eli Brown (E)     Date