32.

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**CIVIL ACTION NO: 1:02CV00862**

FILED
JAN 2 0 2005
IN THIS OFFICE
Clerk U. S. District Court
Greensboro, N. C.
By _____

ELI BROWN, III                              )
                                            )
        Plaintiff,                )
                                            )   **PLAINTIFF'S RESPONSE AND**
    v.                            )   **INCORPORATED MEMORANDUM**
                                            )   **OF LAW IN RESPONSE TO**
MICHAEL C. FLOWERS, aka                     )   **DEFENDANT'S MOTION FOR**
"MIKE CITY,"                                )   **SUMMARY JUDGMENT**
                                            )
        Defendant.                )
_____)

    Now Comes the Plaintiff, by and through his undersigned counsel of record, and in

opposition to the Defendant's motion for summary judgment, shows unto the Court the following:

## PROCEDURAL STATUS

1.    Plaintiff Eli Brown, III ("Brown"), filed this action on October 8, 2002 seeking damages from

the Defendant, Michael C. Flowers ("Flowers"), for copyright violations, and seeking damages fro

breach of contract, breach of partnership agreement, a partnership accounting, breach of fiduciary

duty, misrepresentation, fraud and unfair and deceptive trade practices.

2.    Flowers was served with the Summons and Complaint on December 4, 2002 as evidenced by

the return of service filed herein on December 19, 2002.

3.    Flowers filed a motion to dismiss the copyright claims of Brown on January 10, 2003 along

with a motion to dismiss for improper venue or, in the alternative, to change venue on the basis of

forum non conveniens.

4.    By an order entered on December 12, 2003, the Court granted the motion to dismiss as to

claims based on copyright, but ruled that since "Defendant did not address Plaintiff's state law claims

in his Motion to Dismiss," the state law claims remained. In addition, the Court denied the motion to dismiss for improper venue as well as the motion to change venue.

5.    Flowers then filed an Answer setting up general denials and seven affirmative defenses to the Brown's claims on January 16, 2004

6.    The Court entered a Joint Rule 26(f) Report on or about February 26, 2004 establishing a discovery plan and mandating the exchange of information required by FRCP 26(a) to be completed on or before March 15, 2004. Plaintiff served his Rule 26(a) disclosures on March 15, 2004. The Defendant failed to comply with the disclosure requirements of Rule 26(a) and the February 26, 2004 Rule 26(f) report, eventually serving his Rule 26(a) disclosures on or about May 14, 2004. In response, Brown filed a motion June 24, 2004 seeking an extension of the discovery deadlines in the case by 60 days, a time which was equal to the delay in Defendant's production of materials under FRCP 26(a). The Plaintiff's motion was granted and all discovery deadlines were extended by 60 days by order of the Court entered on July 12, 2004.

7.    On July 20, 2004, Brown served Requests for Admission on Flowers, to which Flowers responded. A true and correct copy of the responses to Plaintiff's First Requests for Admissions is attached hereto as Exhibit "A" and incorporated by reference as if fully set forth herein.

8.    On or about August 9, 2004, Brown served his First Set of Interrogatories and First Requests for Production of Documents and Things on Flowers; Flowers served responses to the Interrogatories and Requests for Production that raised specious objections and otherwise failed to provide the information requested. True and correct copies of Defendant's responses to Plaintiff's Interrogatories and Requests for Production are attached hereto as Exhibits "B" and "C," respectively, and incorporated by reference as if fully set forth herein.

- 2 -

9.    On or about August 18, 2004, Plaintiff served upon Defendant a Notice of Deposition and Rule 30(b)(5) Request for Production of Documents setting the deposition of Flowers for September 13, 2004 in Los Angeles, California. Flowers refused to produce any of the documents requested in the Rule 30(b)(5) request. A true and correct copy of the Notice of Deposition and Rule 30(b)(5) Request for Production of Documents is attached hereto as Exhibit "D" and is incorporated by reference as if fully set forth herein.

10.    Defendant's failure to respond in good faith to Plaintiff's discovery requests prompted the Plaintiff to file a Motion for Sanctions and to Compel Discovery on or about October 13, 2004. A hearing on that motion is scheduled for January 31, 2005.

11.    Flowers now seeks to take advantage of his failure to make discovery by filing a motion for summary judgment that relies on a Declaration of Flowers that attempts to explain away matters already admitted and which relies heavily on information concealed from Plaintiff and from the Court that rightfully should have been produced by Defendant in his Rule 26(a) disclosures, in his response to Plaintiff's Rule 34 Requests for Production of Documents and Things, or in his response to Plaintiff's Notice of Deposition and Rule 30(b)(5) Request for Production of Documents.

## STATEMENT OF FACTS

Brown and Flowers entered into partnership in 1994 to pursue a variety of projects and activities designed to do one thing: earn both of them a profitable career in the music industry. The Declarations of Brown, Velvet Brown, Daniel Walker and Leslie Blair, attached hereto collectively as Exhibit "E" make clear that Brown and Flowers pursuit of these aims included producing recordings for specific musical groups, as with the groups "Lost Souls" and "Simple Pleasures," producing discrete recordings aimed at producing additional recording business, as with "The North

- 3 -

Carolina Project," and included long hours of hard work refining the talents of Flowers as a performer and song writer. As the Declarations in Exhibit "E" make clear, Flowers deserted the partnership at precisely the moment of its initial commercial success with songs recorded by Carl Thomas and included on his hit album, "Emotional," released in April of 2000. Only when Flowers knew that music originally produced during the time of the partnership and in furtherance of partnership business was to be recorded by Carl Thomas did he repudiate the partnership.

Further, as the Declarations of Brown and Velvet Brown in Exhibit "E" make clear, what Flowers refers to as "occasional non-exclusive access" to the studio in Brown's home (Flowers Declaration, p. 2, ¶ 8), in fact Flowers had unlimited and exclusive access. Until approximately 1998, Flowers took advantage of unlimited access to the Brown studio, having his own key and often letting himself in when the Brown family was not even at home. In addition, Brown made cash expenditures purchasing equipment that Flowers wanted for the studio and to finance what can best be described as marketing tours designed to create a "buzz" about the work being done in Brown's studio.

Further facts shall be adduced as necessary during the course of the argument.

## QUESTIONS PRESENTED

Pursuant to Local Rule 7.2(a)(3), Brown submits that the following questions are presented:

1. Whether there exist genuine issues of material fact as to the formation, purposes and duration of the Hectic Records partnership.

2. Whether Flowers breached the partnership agreement between him and Brown.

3. Whether Flowers breached the fiduciary duty that he owed to Brown as a member of the Hectic Records partnership.

- 4 -

4.      Whether Flowers committed unfair and deceptive trade practices against Brown during the life of the Hectic Records partnership.

## ARGUMENT

**A.    Standard for Summary Judgment**

The basic standard for summary judgment is clearly articulated by FRCP 56(c): "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See also, Eubanks v. Prudential Insurance Company of America, 336 F.Supp. 2d 521, 527* (M.D.N.C., 2004). Where there is evidence which "could lead a reasonable juror to find for the party opposing summary judgment, a genuine issue of material fact exists and summary judgment may not be granted." *Eubanks, 336 F.Supp. at 527-28.* In ruling on the issue of whether a genuine issue of material fact exists, "the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor." *Ibid.* Finally, it has been said that "the basic question in a summary judgment inquiry is whether the evidence is so one-sided that one party must prevail as a matter of law." *Ibid, internal quotation marks omitted.*

Applying those criteria, it becomes clear from the affidavits on file in this case and from the applicable law that Flowers motion for summary judgment must be denied.

**B.    Plaintiff's claim for breach of contract/partnership agreement**

The contract in this case is a partnership agreement. Under North Carolina law "a partnership may be formed orally ... it may be created by the agreement or conduct of the parties, either express

- 5 -

or implied ... and a finding of its existence may be based upon a rational consideration of the acts and declarations of the parties, warranting the inference that the parties understood that they were partners and acted as such." *Compton v. Kirby*, *157 N.C. App. 1, 11, 577 S.E.2d 905, 912* (2003); quoting *Eggleston v. Eggleston*, *228 N.C. 668, 674, 47 S.E.2d 243, 247* (1948).

Flowers relies on his Declaration to refute the allegations of the Complaint concerning the existence of a contract between the parties. Flowers admits the existence of a partnership between the parties in his Declaration (Flowers Dec., ¶ 5), in his responses to the Plaintiff's Requests for Admissions (Defendant's Responses to Plaintiff's Requests for Admissions, Number 2), and in his brief (p. 2).

In light of these admissions, it is difficult to see how Flowers can imagine that he is entitled to summary judgment on Plaintiff's contract and partnership claims. Flowers admits a partnership, but the declarations on file herein make clear that there are genuine issues of material fact as to the nature of the agreement, the scope of the agreement, and the dissolution of the agreement.

The declarations supplied by Plaintiff in Exhibit "E" raise a number of questions concerning the contract that existed between these parties. Brown's declaration makes clear that the collaborative work began when Flowers returned to Durham after a brief absence after he graduated from college. (Brown Declaration, ¶ 6) Brown also articulates the partners' business plan (Brown Declaration, ¶ 7 and ¶ 13) and notes that the financial arrangement was a 50-50 arrangement.

Defendant asserts that the partnership was terminated in August of 1999. Defendant refers to the "termination" of the partnership. The Defendant's conflation of the terms "termination" and "dissolution" is instructive. Under N.C. Gen. Stat. §59-59, the proper term for Defendant's action, whenever it took place, is "dissolution." That is, Flowers dissolved the partnership at some time,

- 6 -

although that time is open to question. Notably, under North Carolina law, dissolution of the partnership does not effect a termination of the partnership; the partnership "continues until the winding up of partnership affairs is completed." N.C. Gen. Stat. §59-60; *see also, In re Weiss, 111 F.3d 1159, 1166 cert. denied, 522 U.S. 950, 118 S.Ct. 369, 139 L.Ed.2d 287 (4th Cir., 1997).* "Dissolution designates the point in time when the partners cease to carry on business together; termination is the point when all the partnership affairs are wound up." *Ibid., quoting Baker v. Rushing, 104 N.C. App. 240, 250, 409 S.E.2d 108, 113 (1991).* Thus, in this case the partnership was dissolved at some point, but in fact it has never been terminated within the meaning of North Carolina law.

The Declarations in Exhibit "E" call into questions the time that such dissolution took place. Flowers assets that dissolution occurred in August of 1999 when he left Durham for New Jersey. (Flowers Dec., ¶ 9) The Declarations of Plaintiff in Exhibit "E" call that timing of the dissolution into question, however. Brown and Velvet Brown indicate that travel was part and parcel of the partnership and that the August 1999 trip did not appear to be anything out of the ordinary. (Brown Dec., ¶ 16; Velvet Brown Dec., ¶ 10) It was not until sometime after Flowers had secured a commitment to have two songs recorded on the Carl Thomas album, "Emotional," that he dissolved the partnership. (Brown Dec., ¶ 17; Velvet Brown Dec., ¶10)

As noted above, however, dissolution of the partnership business, however it comes about, does not relieve the partners of the duty to account to one another for partnership business. Indeed, in a 50-50 partnership, the partners share the profits and the losses. If partnership business resulted in income in which the partnership had an interest, then the partner obtaining that income has a fiduciary duty to share that income. Similarly, if the profit suffered losses, the partner bearing the

- 7 -

greater share of those losses is entitled to compensation from the other partner. Those rights and responsibilities must be determined by a winding up of partnership affairs and an accounting. Plaintiff is clearly entitled to a partnership accounting in this case under N.C Gen. Stat. § 59-52.

Finally, as to the contract claim, Defendant makes the curious assertion that Plaintiff attempts in some way to restrict Flowers' right to do business. The statute cited by Defendant on this issue, N.C. Gen. Stat. §75-4, applies to non-competition agreements and requires that such agreements be reduced to writing. *See, Ashley Furniture Industries, Inc. v. Sangiacomo N.A. Limited, 187 F.3d 363 (4th Cir., 1999).* The Fourth Circuit reviewed the North Carolina cases interpreting N.C. Gen. Stat. § 75-4 and concluded that North Carolina courts "applied this provisions to agreements prohibiting former employees or business associates from entering into businesses that compete with their former employers or associates." *Id., at 378.* Clearly § 74-4 has no application here. Brown is not asserting that Flowers "cannot do business." Brown is asserting that Flowers conducted partnership business without accounting to Brown for the fruits derived from such partnership business.

As was noted above, under North Carolina partnership law, a partnership may be formed orally, and "may be created by the agreement or conduct of the parties, either express or implied." *Compton v. Kirby, 157 N.C. App. at 11, 577 S.E.2d at 912.* Thus, if there was any restriction on Flowers' ability to do business, it was as a result of a partnership agreement. Plaintiff has not alleged a non-competition agreement; Plaintiff has alleged, and has brought forward evidence to show, the existence of a partnership voluntarily entered into by Flowers. Flowers has admitted the existence of a partnership, and attached to his Declaration is a written memorial of that partnership agreement. It is the existence of the partnership that requires him to account to his former partner, not a phantom non-competition agreement.

- 8 -

## C.    Plaintiff is entitled to a partnership accounting

Having shown at the very least that there are genuine issues of material fact as to the existence of a partnership agreement between these parties, it would follow that the Plaintiff is entitled to a partnership accounting pursuant to N.C. Gen. Stat. § 59-52. Plaintiff submits that the facts before the court clearly show the existence of a partnership agreement breached by the Defendant. It is for this reason that Plaintiff sought, and now seeks an order compelling, production of Flowers financial records and contractual dealings.[1]

Even assuming *arguendo* that Flowers did not misappropriate any partnership assets in making his mark in popular music, the declarations in Exhibit "E" all maintain that Flowers spent substantial amounts of time in, and had unlimited access to, Brown's recording studio. The declarations of Brown and Velvet Brown also make clear that Brown expended large sums of money on behalf of the partnership in purchasing equipment and in paying for marketing trips by Flowers on behalf of the partnership. (Brown Dec., ¶¶ 6-8; Velvet Brown Dec., ¶¶ 4-5) There remains, then, a basis for partnership accounting for his partnership share of those expenses and others even if Flowers can demonstrate that somehow his success in the music business had nothing to do with the start he got as a member of the Hectic Records partnership.

## D.    Flowers engaged in fraudulent concealment or negligent misrepresentation of his business activities

As a partner in Hectic Records, a fact which Flowers admits, Flowers owed his partner, Brown, a fiduciary duty to disclose the nature and content of all negotiations relevant to partnership business. N.C. Gen. Stat. §59-51. Brown, of course, owed the same duty to Flowers. Flowers

---

1 A hearing on Plaintiff's Motion for Sacntions and Motion to Compel Discovery is pending

cavalier dismissal of the negligent misrepresentation claim of the complaint concludes that "because there is no evidence of any negotiations that related to the Hectic Records partnership, there can be no duty to disclose such negotiations." (Defendant's brief, p. 9, § E) The evidence before the court and the reasonable inferences that can be drawn therefrom are this: Flowers was in a partnership designed to propel the partners into the music business. While involved in that partnership, Flowers entered into negotiations on many occasions. Many were unsuccessful, but finally, one negotiation was productive, and Flowers now wants this court to approve his unilateral determination that only the unsuccessful projects were Hectic Records projects, and that the successes were all his. Plaintiff takes the position that his failure to reveal these negotiations to his partner was either an act of fraudulent concealment or negligent misrepresentation, and in either case a breach of his fiduciary duty. Either way, Flowers is accountable to his former partner for the successful negotiations that occurred during the life of the partnership.

As noted above, a question of fact exists as to the time of the dissolution of the partnership. Flowers admissions make clear that he was engaged in partnership business up until the time he learned that he had a real "in" with Bad Boy Records through Carl Thomas. After that time, he was ready to announce that he considered the partnership over. Those actions are unconscionable.

**E.     Flowers breach of fiduciary duty is a clear question of fact that must be resolved in Brown's favor**

The facts before the court make clear that Flowers breached his fiduciary duty to Brown. As much as Flowers would like to pick and choose when he owed a duty a when he did not, the facts admitted and contained in the Exhibit "E" Declarations of the Plaintiff make clear that Flowers was a

---

before the Court and is set for oral argument on January 31, 2005.

partner who therefore owed a fiduciary duty to his partner pursuant to N.C. Gen. Stat. § 59-51. There was a partnership agreement between these parties, Flowers admits as much. The factual dispute between the parties is exactly what the nature and purpose of that agreement was. Flowers asserts that the partnership was a limited attempt to promote the "Lost Souls" and the "The North Carolina Project." Brown maintains that the partnership was far broader than that, encompassing a specific business plan designed to give both partners a career in music. That factual dispute alone is sufficient to overcome Defendant's motion for summary judgment.

As noted above, N.C. Gen. Stat. § 59-51 imposes fiduciary duties upon partners, each to the other. Flowers breached his duty by engaging in self-dealing and then declaring the partnership dissolved as soon as his self-dealing paid a dividend. Under North Carolina law,

> It is elementary that the relationship of partners is fiduciary
> and imposes on them the obligation of the utmost good faith in
> their dealings with one another in respect to partnership
> affairs. Each is a confidential agent of the other, and each has
> a right to know all that the others know, and each is required
> to make full disclosure of all material facts within his
> knowledge in any way relating to the partnership affairs.

*Casey v. Grantham*, 239 N.C. 121, 124-25, 79 S.E.2d 735, 738 (1954). Self-dealing constitutes a breach of a partner's fiduciary duty. *Compton v. Kirby*, 157 N.C. App. at 15, 577 S.E.2d at 914; *see also Reddington v. Thomas*, 45 N.C. App. 236, 262 S.E.2d 841 (1980). Because there is a clear factual dispute as to the nature of the partnership agreement, it is clear that summary judgment cannot lie of the question of breach of fiduciary duty.

**G.      The facts show the commission by Flowers of unfair and deceptive trade practices**

Defendant makes no claim that the activities complained of in this case occurred outside the stream of commerce. Instead, he apparently admits in his brief a breach of contract when he quotes

- 11 -

from *Jones v. Capitol Broadcasting Co., Inc.*, 128 N.C. App. 271, 495 S.E.2d 172 (1998) that "a mere breach of contract, even if intentional, is not an unfair competition or a deceptive act under G.S. § 75-1.1." *128 N.C. App. at 276, 495 S.E.2d at 175; Defendant's Brief, p. 10.* What Defendant overlooks is that the breach of contract he apparently concedes in his brief was a breach of a partnership agreement entailing a breach of fiduciary duty.

Part and parcel of a breach of fiduciary duty is constructive fraud. In *Compton v. Kirby, supra,* the Court of Appeals said "a breach of fiduciary duty amounts to constructive fraud." *157 N.C. App. at 16, 577 S.E.2d at 915.* The Court of Appeals went to note that "North Carolina case law has held that conduct which constitutes a breach of fiduciary duty and constructive fraud is sufficient to support a UDTP [Unfair and Deceptive Trade Practice] claim." *157 N.C. App. at 20, 577 S.E.2d at 917; also see Spence v. Spaulding and Perkins, Ltd.,* 82 N.C. App. 665, 668, 437 S.E.2d 864, 866 (1986);*HAJMM Co. v. House of Raeford Farms,* 94 N.C. App. 1, 14, 379 S.E.2d 868, 876; and *Wilson v. Wilson-Cook Medical, Inc.,* 720 F.Supp. 533, 542 (M.D.N.C., 1989). Thus, under North Carolina law, where there is a breach of fiduciary duty, there is a claim for constructive fraud and a claim for unfair and deceptive trade practices as well.

## CONCLUSION

Defendant's motion for summary judgment must fail. Defendant's admissions of the existence of a partnership and the very different accounts of what the partnership entailed coming from Brown and Flowers make abundantly clear that summary judgment is not appropriate in this case. There are genuine issues of material fact regarding the nature and scope of the partnership agreement between the Defendant and Brown, from which flow issues concerning breach of fiduciary duty, fraud, and unfair and deceptive trade practices. Finally, although Defendant

- 12 -

acknowledges that the partnership was dissolved, it is clear that there has never been an accounting

and termination of the partnership as required by statute.

**WHEREFORE,** Plaintiff respectfully prays the Court deny the motion for summary

judgment.

This the 20th day of January, 2005.

STARK LAW GROUP, PLLC

By: _____

W. Russell Congleton
N.C. State Bar No. 31983
Thomas H. Stark
N.C. State Bar No. 10052
Attorneys for Plaintiff
5925 Farrington Road, Suite 200
Chapel Hill, NC 27517
Telephone:    (919) 490-5550
Facsimile:    (919) 490-5551

- 13 -

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this date served the foregoing document by causing copies of same to be placed in an official depository under the exclusive care and custody of the United States Postal Service, postage prepaid, first class, addressed as follows:

Stephen E. Robertson, Esquire
Robertson, Medlin & Troutman, PLLC
400 W. Market Street, Suite 501
Greensboro, NC 27401

Reginald K. Brown, Esquire
Law Office of Reginald K. Brown
6080 Center Drive, 6th Floor
Los Angeles, CA 90045

This the _20th_ day of January, 2005.

STARK LAW GROUP, PLLC

By: _____

W. Russell Congleton
State Bar No. 31983
5925 Farrington Road, Suite 200
Chapel Hill, NC 27517
Telephone: (919) 490-5550
Facsimile: (919) 490-5551

- 14 -

**EXHIBIT A**

**TO**

**PLAINTIFF'S RESPONSE**

**TO**

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**PLAINTIFF'S FIRST REQUESTS FOR ADMISSIONS**

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## CIVIL ACTION NO: 1:02CV00862

|  |  |  |
|---|---|---|
| ELI BROWN, III | ) | |
|  | ) | |
| Plaintiff, | ) | |
|  | ) | **DEFENDANT'S RESPONSES TO** |
| v. | ) | **PLAINTIFF'S FIRST SET OF REQUESTS** |
|  | ) | **FOR ADMISSIONS** |
| MICHAEL C. FLOWERS, aka | ) | |
| "MIKE CITY," | ) | |
|  | ) | |
| Defendants. | ) | |
|  | ) | |

Defendant MICHAEL C. FLOWERS, aka "Mike City" responds to Plaintiff's First

Set of Requests for Admissions as follows:

### REQUEST NO. 1:

Admit that the Defendant and the Plaintiff entered into a partnership arrangement

in 1994.

### RESPONSE TO REQUEST NO. 1:

Deny.

### REQUEST NO. 2:

Admit that the partnership arrangement between you and the Plaintiff was never

formally terminated in writing by either party.

### RESPONSE TO REQUEST NO. 2:

The Hectic Records oral partnership agreement was not formally terminated in

-1-

writing.

**REQUEST NO. 3:**

Admit that you were permitted unlimited access to the Plaintiff's recording studio as part of the partnership agreement with Plaintiff.

**RESPONSE TO REQUEST NO. 3:**

Deny.

**REQUEST NO. 4:**

Admit that you requested that the Plaintiff obtain a number of specific items of equipment for Plaintiff's studio, including but not limited to, mixing boards, microphones and keyboards.

**RESPONSE TO REQUEST NO. 4:**

Deny.

**REQUEST NO. 5:**

Admit that you recorded music that you composed in Plaintiff's studio to use as demo tapes in furtherance of partnership business.

**RESPONSE TO REQUEST NO. 5:**

Objection. Not relevant to the claim or defense of any party.

**REQUEST NO. 6:**

Admit that in February of 2000, after music you sold achieved success and with no prior notice to Plaintiff, you had a telephone conversation with Plaintiff in which you repudiated the partnership and told him he would never see a dime.

**RESPONSE TO REQUEST NO. 6:**

-2-

Deny.

**REQUEST NO. 7:**

Admit that the partnership agreement between you and the Plaintiff contemplated a sharing of all income derived from the use of Plaintiff's studio by artists recruited by you or the Plaintiff, from the management of artists recruited by you or the Plaintiff, and from the sale of any and all music composed, whether in the form of music only, lyrics only, or music and lyrics, during the life of the partnership.

**RESPONSE TO REQUEST NO. 7:**

Objection: Vague and ambiguous. Without waiving said objection, Defendant responds as follows: Deny.

**REQUEST NO. 8:**

Admit that the Plaintiff, in furtherance of partnership business, provided funding in order that you could attend trade shows and travel to various locations in an attempt to recruit talent for the partnership business and attempt to secure recording contracts on behalf of the partnership.

**RESPONSE TO REQUEST NO. 8:**

Deny.

**REQUEST NO. 9:**

Admit that upon your repudiation of the partnership in February of 2000, you had in your possession numerous recordings and musical compositions made during the time the partnership was in existence and made in furtherance of partnership business using facilities provided by the Plaintiff.

-3-

**RESPONSE TO REQUEST NO. 9:**

Defendant admits that he had copies of recordings recorded and released pursuant to the Hectic Records oral partnership. Defendant denies that any musical compositions were created "in furtherance of partnership business."

**REQUEST NO. 10:**

Admit that the goals of the partnership included advancing the Plaintiff's reputation as a musical engineer and music promoter as well as advancing your career as a songwriter and music producer.

**RESPONSE TO REQUEST NO. 10:**

Deny.

**REQUEST NO. 11:**

Admit that you have benefited [sic] financially from music initially composed during the time of and in furtherance of the partnership.

**RESPONSE TO REQUEST NO. 11:**

Deny.

**REQUEST NO. 12:**

Admit that you never indicated to the Plaintiff that you believed the partnership was terminated until after you had sold a song that was eventually recorded by Carl Thomas under the title, "I Wish."

**RESPONSE TO REQUEST NO. 12:**

Objection. Not relevant to the claim or defense of any party.

**REQUEST NO. 13:**

Admit that the contract for the sale of the song that was recorded by Carl Thomas

-4-

as "I Wish" was the type of contribution that you were expected to make to the partnership business.

**RESPONSE TO REQUEST NO. 13:**

Deny.

**REQUEST NO. 14:**

Admit that the contract you signed with Warner Chappell music is the type of contractual arrangement that you and the Plaintiff sought for the partnership.

**RESPONSE TO REQUEST NO. 14:**

Objection. Not relevant to the claim or defense of any party. Without waiving said objection, Defendant responds as follows: Deny.

**REQUEST NO. 15:**

Admit that much of the music you used to obtain a contract with Warner Chappell is music that was initially recorded during the time of the partnership and in furtherance of partnership business.

**RESPONSE TO REQUEST NO. 15:**

Objection. Not relevant to the claim or defense of any party. Without waiving said objection, Defendant responds as follows: Deny.

Reginald K. Brown
Attorney for Defendant
*admitted pro hac vice*
6080 Center Drive, 6th Floor
Los Angeles, CA 90045

Stephen E. Robertson
Attorney for Defendant
State Bar No. 27608
400 W. Market Street, Suite 501
Greensboro, NC 27401

-5-

## CERTIFICATE OF SERVICE

I, the undersigned, certify that a copy of the foregoing Defendant's Responses to

Plaintiff's First Set of Requests for Admissions has been served upon the following individuals

by deposit in the United States Mail, postage prepaid, and addressed as follows:

> Thomas H. Stark, Esq.
> Stark Law Group, LLP
> 5925 Farrington Road, Suite 200
> Chapel Hill, NC 27517

Dated: August 20, 2004

*Reginald K. Brown*

Reginald K. Brown
6080 Center Drive, 6th Floor
Los Angeles, CA 90045

**EXHIBIT B**

**TO**

**PLAINTIFF'S RESPONSE**

**TO**

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**DEFENDANT'S RESPONSES TO PLAINTIFF'S**

**FIRST SET OF INTERROGATORIES**

|  |  |  |
|---|---|---|
| ELI BROWN, III | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S RESPONSE TO** |
| v. | ) | **PLAINTIFF'S FIRST SET OF** |
| | ) | **INTERROGATORIES** |
| MICHAEL C. FLOWERS, aka | ) | |
| "MIKE CITY," | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Defendant MICHAEL C. FLOWERS, aka "Mike City" responds to Plaintiff's First

Set of Interrogatories as follows:

## INTERROGATORY NO. 1:

Describe the nature of the partnership agreement between you and the Plaintiff in

terms of your areas of responsibility as a partner to the Plaintiff, partnership goals, and the

specific actions you undertook in furtherance of the partnership.

## RESPONSE TO INTERROGATORY NO. 1:

With respect to the Hectic Records partnership, Defendant agreed to produce

recording artists that Plaintiff discovered. In exchange, Defendant was permitted to use

Plaintiff's studio. Defendant also agreed to secure a distribution agreement for

the partnerhship. Additionally, Defendant agreed to finance the marketing and promotion of

records released by the partnership.

-1-

**INTERROGATORY NO. 2:**

Provide an estimate of the amount of time you spent using the Plaintiff's recording facilities in Durham, North Carolina between 1994 and March of 2000. Describe with specificity the tasks that you performed during such sessions ans any activities of the Plaintiff during such sessions.

**RESPONSE TO INTERROGATORY NO. 2:**

The last time Defendant was in the studio was 1999. Defendant produced recordings. Plaintiff engineered the recording sessions. Best estimate of time spent is less than 20 hours a week.

**INTERROGATORY NO. 3:**

Identify any musician, singer, vocal group, band, or other artist that you contacted in furtherance of the partnership between you and the Plaintiff. State when and how contact was made and whether any contractual arrangement was made between such musician, singer, vocal group, band or other artist and the partnership.

**RESPONSE TO INTERROGATORY NO. 3:**

The group was "Lost Souls" whose members were Omar Wilson, Terrence Rhodes, Richard Clark, Christopher Hall.. No agreement was ever signed with members of the group.

**INTERROGATORY NO. 4:**

With respect to any persons identified in response to Interrogatory No. 3 above, please state whether the person or persons identified used the Plaintiff's recording facilities. If so, state with specificity your role and the role of the Plaintiff in assisting such persons

-2-

during their time in the Plaintiff's recording facilities.

**RESPONSE TO INTERROGATORY NO. 4:**

The Los Souls recorded an album at the Plaintiff's studio.

**INTERROGATORY NO. 5:**

State whether you and the Plaintiff ever made plans to incorporate the partnership between you. If so, what were to be the goals of the incorporated business? If so, was the business ever incorporated? If it was not incorporated, state why not.

**RESPONSE TO INTERROGATORY NO. 5:**

Yes, there was an intention to incorporate. The goal was to sign recording acts and release records. It is unknown why the business was not incorporated.

**INTERROGATORY NO. 6:**

State with specificity when the music and lyrics to the song, "I Wish," were written.

**RESPONSE TO INTERROGATORY NO. 6:**

"I Wish" - music was written in 1995 or 1996. Lyrics were written in 1998.

**INTERROGATORY NO. 7:**

State with specificity when the lyrics and music for the song, "Lunch or Dinner" were written.

**RESPONSE TO INTERROGATORY NO. 7:**

"Lunch or Dinner" music was written in 1998. Lyrics written 1999.

**INTERROGATORY NO. 8:**

Have you formed any partnerships, corporations, limited liability companies, limited partnerships or other business associations in furtherance of your career a

-3-

songwriter and publisher? If so, identify such partnerships, corporation, limited liability company, limited partnership or other business association. For each partnership identify the general partners and any managing partner. For each corporation identify the officers and members of the board of directors. For each limited liability company identify the members and the manager. For each limited partnership, identify all partners including the limited partners. For each other business association, identify the members and managers.

## RESPONSE TO INTERROGATORY NO. 8:

Objection. Not relevant to the claim or defense of any party.

## INTERROGATORY NO. 9:

Identify all persons present during recording sessions at the Plaintiff's studio where compositions created by you were recorded. Please state with particularity the role each such person played in the recording session, if any.

## RESPONSE TO INTERROGATORY NO. 9:

Objection. Not relevant to the claim or defense of any party.

## INTERROGATORY NO. 10:

With regard to the general denials of the allegations of the Complaint contained in you Answer to the Complaint, state the specific facts upon which you rely to assert such denials.

## RESPONSE TO INTERROGATORY NO. 10:

Objection. Vague and ambiguous; overbroad.

## INTERROGATORY NO. 11:

Please state with particularity you understanding of the facts and circumstances that resulted in the termination of the partnership between you and the Plaintiff. State how you

-4-

determined that the partnership was terminated.

**RESPONSE TO INTERROGATORY NO. 11:**

In August of 1999, Defendant moved to New Jersey and told Plaintiff that he no longer wanted to continue the Hectic Records partnership.

**INTERROGATORY NO. 12:**

Identify all musical compositions that you worked on in any capacity during the period of the partnership with the Plaintiff. Identify those musical compositions that were recorded by any means in the Plaintiff's studio. Identify which if any of the musical compositions identified in response to this interrogatory have been recorded by any artist, identifying the artist and the time, date and place of the recording by the artist.

**RESPONSE TO INTERROGATORY NO. 12:**

Objection. Not relevant to the claim or defense of any party.

**INTERROGATORY NO. 13:**

Identify all persons whom you expect to call as witnesses in the trial of this case, stating the substance of the facts to which each person so identified can testify.

**RESPONSE TO INTERROGATORY NO. 13:**

Objection, this request attempts to circumvent local rules concerning pre-trial disclosures.

**INTERROGATORY NO. 14:**

Identify any expert witness that you intend to call to testify in the trial of this matter, stating the substance of the testimony and the facts upon which the expert's opinion is based. Identify any reports relied upon by the expert in forming the opinions to which the expert will testify.

**RESPONSE TO INTERROGATORY NO. 14:**

Objection, this request attempts to circumvent local rules concerning pre-trial disclosures.

**INTERROGATORY NO. 15:**

Identify any person not previously identified who may have information concerning the business relationship between you and the Plaintiff.

**RESPONSE TO INTERROGATORY NO. 15:**

Edward Milligan: telephone number - 201/780-2947; Velvet Brown, Plaintiff's wife.

Reginald K. Brown
Attorney for Defendant
*admitted pro hac vice*
6080 Center Drive, 6th Floor
Los Angeles, CA 90045

Stephen E. Robertson
Attorney for Defendant
State Bar No. 27608
400 W. Market Street, Suite 501
Greensboro, NC 27401

# EXHIBIT C

## TO

## PLAINTIFF'S RESPONSE

## TO

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**************************

## DEFENDANT'S RESPONSES TO PLAINTIFF'S
## FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND
## THINGS



# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CIVIL ACTION NO: 1:02CV00862

ELI BROWN, III )
)
       Plaintiff, )
) **DEFENDANT'S RESPONSE TO**
    v. ) **PLAINTIFF'S FIRST SET FOR**
) **PRODUCTION OF DOCUMENTS AND**
MICHAEL C. FLOWERS, aka ) **THINGS**
"MIKE CITY," )
)
    Defendants. )
)

Defendant MICHAEL C. FLOWERS, aka "Mike City" responds to Plaintiff's First

Set of Requests for Production of Documents and Things as follows:

**REQUEST NO. 1:**

Produce all documents identified in response to the interrogatories above.

**RESPONSE TO REQUEST NO. 1:**

Not applicable.

**REQUEST NO. 2:**

Produce all personal federal income tax returns for the tax years 1998 through 2003,

inclusive.

**RESPONSE TO REQUEST NO. 2:**

Objection. Invasion of privacy. Relevance.

**REQUEST NO. 3:**

-1-

Produce any and all personal services contracts, recording agreements, production contracts or management agreements entered into between you and any other person or entity from June 30, 1999 through June 30, 2004.

**RESPONSE TO REQUEST NO. 3:**

Objection. Invasion of privacy. Relevance.

**REQUEST NO. 4:**

Produce any compact discs, cassette tapes, reel-to-reel tapes or other recordings in your possession or under your control that were made in the Plaintiff's recording studio.

**RESPONSE TO REQUEST NO. 4:**

Defendant will comply with this Request.

**REQUEST NO. 5:**

Produce any written reports made by experts employed by you in connection with this case regardless of whether you intend to call said expert as a witness in the trial of this case.

**RESPONSE TO REQUEST NO. 5:**

Not applicable.

**REQUEST NO. 6:**

Produce any and all correspondence in your possession or under your control relating to the partnership between you and the Plaintiff.

**RESPONSE TO REQUEST NO. 6:**

Defendant is unaware of any such correspondence.

**REQUEST NO. 7:**

-2-

If not already produced, provide any and all documents that you believe refute the claims and allegations of the Complaint.

**RESPONSE TO REQUEST NO. 7:**

All such known documents were produced with Defendant's Initial Disclosures.

**REQUEST NO. 8:**

If not already produced, provide any and all documents that you believe support the claims and allegations made in your Answer to the Complaint.

**RESPONSE TO REQUEST NO. 8:**

All such known documents were produced with Defendant's Initial Disclosures.

**REQUEST NO. 9:**

If not already produced, provide all documents that you intend to produce as exhibits at the trial of this matter.

**RESPONSE TO REQUEST NO. 9:**

Objection, this request attempts to circumvent local rules concerning pre-trial disclosures.

**REQUEST NO. 10:**

If not already produced, produce all electronic communications, including e-mails, with any person or entity that relate to the subject matter of this lawsuit.

**RESPONSE TO REQUEST NO. 10:**

Defendant is unaware of any such documents.

**REQUEST NO. 11:**

Produce a list of all musical compositions created by you between 1994 and

-3-

February of 2000.

**RESPONSE TO REQUEST NO. 11:**

Defendant is unaware of any such document.

**REQUEST NO. 12:**

If not already produced, provide any and all documents which you believe support

the factual statements made by you in response to Interrogatories 1 through 15, above.

**RESPONSE TO REQUEST NO. 12:**

All such known documents were produced with Defendant's Initial Disclosures.

Reginald K. Brown
Attorney for Defendant
*admitted pro hac vice*
6080 Center Drive, 6th Floor
Los Angeles, CA 90045

Stephen E. Robertson
Attorney for Defendant
State Bar No. 27608
400 W. Market Street, Suite 501
Greensboro, NC 27401

-4-

## CERTIFICATE OF SERVICE

I, the undersigned, certify that a copy of the foregoing Defendant's Responses to Plaintiff's First Set of Requests for Production of Documents and Things has been served upon the following individuals via fax and by deposit in the United States Mail, postage prepaid, and addressed as follows:

> Thomas H. Stark, Esq.
> Stark Law Group, LLP
> 5925 Farrington Road, Suite 200
> Chapel Hill, NC 27517
> (919) 490-5551

Dated: September 8, 2004

Reginald K. Brown
6080 Center Drive, 6th Floor
Los Angeles, CA 90045

**EXHIBIT D**

**TO**

**PLAINTIFF'S RESPONSE**

**TO**

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**NOTICE OF DEPOSITION**
**AND**
**RULE 30(b)(5) REQUEST FOR PRODUCTION OF DOCUMENTS**

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CIVIL ACTION NO: 1:02CV00862

| | | |
|---|---|---|
| ELI BROWN, III | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **NOTICE OF DEPOSITION AND** |
| | ) | **RULE 30(b) 5 REQUEST FOR** |
| MICHAEL C. FLOWERS, aka | ) | **PRODUCTION OF DOCUMENTS** |
| "MIKE CITY," | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Pursuant to the provisions of Rules 26 and 30 of the Federal Rules of Civil Procedure you are hereby notified that on the 13th day of September, 2004, commencing at 10:00 AM at the offices of Reginald K. Brown, 6080 Center Drive, 6th Floor, Los Angeles, CA, the undersigned will take the deposition of Michael C. Flowers. The deposition will be taken under oath before a Notary Public or some other officer duly authorized by law to take said deposition and shall continue thereafter from day to day until completed.

Pursuant to Rules 30(b)(5) and 34 of the Federal Rules of Civil Procedure, you are further commanded to produce for inspection and copying the following documents at 10:00 AM at the Offices of Reginald K. Brown, 6080 Center Drive, Sixth Floor, Los Angeles, CA:

1.      Copies of the Defendant's Federal Income Tax returns for the years 1999 through 2004, inclusive;

2.      Copies of any and all contracts with recording companies entered into by the Defendant from September of 1999 to date;

1

3.     Copies of any letters, memoranda, contracts, or other documents, including such electronic documents as instant messages or emails, relating to the partnership between the Plaintiff and the Defendant in this case; and

4.     Copies of articles of incorporation, articles of organization, or statements of assumed name filed by or on behalf of the Defendant from September of 1999 to date.

This the 18th day of August, 2004.

STARK LAW GROUP, PLLC

By: _____
Thomas H. Stark
N.C. State Bar No. 10052
5925 Farrington Road, Suite 200
Chapel Hill, NC 27517
Telephone:     (919) 490-5550
Facsimile:      (919) 490-5551

2

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this date served the foregoing document via facsimile and by causing copies of same to be placed in an official depository under the exclusive care and custody of the United States Postal Service, postage prepaid, first class, addressed as follows:

Stephen E. Robertson, Esquire
Robertson & Medlin, PLLC
400 W. Market Street, Suite 501
Greensboro, NC 27401

Reginald K. Brown, Esquire
Law Office of Reginald K. Brown
6080 Center Drive, 6th Floor
Los Angeles, CA 90045;

And via facsimile as follows:

Stephen E. Robertson, Esq.
(336) 378-9886

Reginald K. Brown, Esq.
(310) 242-5201

This the 18th day of August, 2004.

STARK LAW GROUP, PLLC

By: _____
W. Russell Congleton
State Bar No. 31983
5925 Farrington Road, Suite 200
Chapel Hill, NC 27517
Telephone: (919) 490-5550
Facsimile: (919) 490-5551

3

**EXHIBIT E**

**TO**

**PLAINTIFF'S RESPONSE**

**TO**

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**★★★★★★★★★★★★★★★★★★★★★★★★**

**DECLARATIONS OF
ELI BROWN, III,
VELVET A. BROWN,
DANIEL WALKER, AND
LESLIE BLAIR**

## DECLARATION OF ELI BROWN, III

I, Eli Brown, III, declare and state:

1.     I am the plaintiff in this action and submit this declaration in opposition to defendant's motion for summary judgment.

2.     Before I met the defendant, I had been a musician, playing saxophone in a number of bands that played live in clubs and other larger venues for about eighteen years. I also had some recording equipment in my home that used personally and occasionally recorded other musical acts as well. I am a graduate of the University of North Carolina in Chapel Hill, and of the North Carolina Central University Business School.

3.     My ward, who lived with us as a son, Aaron Speller ("Aaron"), was a student at North Carolina Central University in the late 1980's. In 1988, he brought home with him a young music major named Mike Flowers ("Mike"). Aaron told me that Mike had a rap group that eventually came to be called "Choyce" that was very popular on campus. I listened to the group, which consisted of Edward "Eddie" Milligan and Kayshawn Etheridge. Eddie was the primary vocalist, but Mike clearly had music talent, and some sense of musical direction although he focused in on 80's "house music."

4.     We talked a great deal and eventually Mike signed an agreement making me his personal manager in 1989. That agreement expired on its own terms in 1992, the year Mike graduated from Central. In those three years, I worked with "Choyce" generally and Mike in particular, encouraging him to think more removing boundaries from his music. I also provided clothes for the group's performances, helped them put together music videos, got them an appearance on local television and generally tried to assist them in the business.

5.     After the management contract expired in 1992 and Mike graduated from Central, an independent producer named Bernard Adell got Mikle noticed by Inter Sound records in Atlanta. Inter Sound was an old line gospel label, but was trying in the early 90's to develop a rap/hip-hop division. Mike obtained a deal to record with Inter Sound and as a consequence, left Durham for Atlanta in 1992. Mike evidently went to Miami to record tracks for the proposed album, but in 1993 I was contacted by Mike's former "Choyce" band-mate, Eddie Milligan, who told me Mike was having some trouble with the recording sessions in Miami and asked me to go there to try and help him out. I traveled to Miami and offered moral support to Mike during the remaining recording sessions. I did no work during the recording sessions, but resumed a similar relationship with Mike to that which we had in Durham: we talked about music and sound and what fit Mike best. The following February, Inter Sound temporarily dropped its plans for a rap division and shelved the album.

6.     After my trip to Miami, Mike decided at some point to return to Durham, which he did late in 1994. We immediately began working on material in my studio for a second album and recorded some Christmas music as well. I did all the production and engineering for the material for a second album, along with the production and engineering of the Christmas songs. During this period of time (1994-95), I spent between $15,000 and $16,000 on recording equipment that Mike requested, including microphones, interfaces, a new mixing board, effects modules and an ASR 10 sampler. We anticipated that Inter Sound would release the first album and that Mike would pay me for the studio time, production and engineering work on the material for the projected

second album with Inter Sound and some Christmas music. Those recording sessions produced sufficient material for a second album.

7.     When Inter Sound reversed its course in February of 1995 and decided to put the first album on the shelf, we had to change our plans. We had some expectation that we would receive some income from the Inter Sound album that would offset the expenses I incurred in adding equipment to the studio. When that came apart because of Inner Sound's reversal, we agreed to work as partners, calling our partnership Hectic Records and sharing profits 50-50 even though I was making virtually all of the cash outlays at the time. Our business plan had three parts. First, we intended to produce a number of low cost 12" vinyl recordings for "underground" play in clubs in an effort to create a "buzz" around the music. Second, we would do engineering and remixing for other artists. Finally, we would make the effort within the industry to make Mike's writing ability and my engineering and production abilities for use by artists already working for established labels.

8.     In furtherance of the latter two parts of our business plan, Mike and I both did a lot of travel around the country. As a practical matter, Mike made more of these trips than I did because he was employed part-time in his father's barber shop while I was engaged in real estate development and construction and simply could not afford to take time away from that business. In addition, beginning in 1995 and throughout our partnership, Mike had unlimited access to the studio at my house. The studio can be accessed directly from outside, and Mike had his own key. It was not at all uncommon for me or members of my family to come home and find Mike working in the studio. By the middle of 1999 the time we worked together in the studio was declining because we

already had hundreds of demos recorded for use in promotion of the partnership. We had also become so accustomed to working together that we could make suggestions in shorthand instead of discussing them in person.

9.      In late 1995 or early 1996, Mike brought in a rapper called Mr. Money Loc to record at the studio. I did the engineering and a substantial portion of the remixing on the album which was released an eventually found its way to #16 on the rap charts. Despite all the work I put into this project at Mike's request, all I ever received in payment was $135.

10.     In 1996 we began to work with a rap group called "Lost Souls." Mike brought the group to me and into the studio. They had a recording deal with In A Minute Records and claimed that they brought a recording budget with them. Mike said I would be paid $15,000 by In A Minute Records for use of the studio and engineering. The record company never brought any cash forward and the deal between the company and "Lost Souls" fell apart, so suddenly getting the "Lost Souls" album out was entirely a Hectic Records partnership project. The work went on for two years with them working at the studio and Mike and I working together. I focused on the production and engineering side. Mike was to performing the marketing tasks. Eventually he obtained a distribution agreement with Ichiban Records. In making the deal with Ichiban, Flowers sent them a letter acknowledging the partnership. The partnership then hired Gerald Crump, who had been in rap production for EMI Records, to handle promotion of the album. Although Crump was hired by the partnership, the funds used came solely from me. Ichiban released the record and it went nowhere. Crump advised us that the record had no appeal on the street. In addition, the language of the tracks were excessively profane to the point

that radio stations would not play the music, and "Lost Souls" refused my offers to produce "clean" tracks. At that point, "Lost Souls" took control of the project and partnership involvement was done.

11. Mike and I then went to work on the North Carolina Project, which was designed to give an opportunity to talented North Carolina-based artists. In contrast to the "Lost Souls" experience, the North Carolina Project ran smoothly and was completed in a month or two. Mike and I disagreed on the songs that should be pushed, however. There were a couple of songs that I thought were quite good, but Mike refused to promote those two songs aggressively because he had personal issues with the artists. In my opinion that is why the North Carolina Project failed to make much of an impression in the music business. It did get Mike some name recognition since the album was released as "Mike City Presents the North Carolina Project." The funding for marketing and promotion came almost entirely from me.

12. While neither of the two albums produced by Hectic Records was a commercial success, they did result in some level of name recognition, especially for Mike. He also was helped along when the old album shelved by Inter Sound in 1995 was dusted off and released in 1998. Because of that, Mike was able to go on a small promotional tour involving well known artists such as Dionne Warwick and Big Daddy Kane. The tour was also an opportunity for Mike to engage in the promotion of another group, "Simple Pleasures," which had signed a production and management contract with Hectic Records in 1998. I spent a lot of time and money on "Simple Pleasures," but Mike's increasingly long absences from Durham put a strain on the project, and ultimately killed it.

13.    In late 1998 or early 1999, as the money and time I was spending on "Simple Pleasures" were going to waste, Mike suggested that we expand our business plan and start selling individual pieces of music to other artists. One of the contacts he had in mind in this regard was Sunshine Anderson, another former North Carolina Central student introduced to Mike and me by Aaron Speller. Ms. Anderson had recorded numerous vocals in my studio, including a feature track on the "Lost Souls" album.

14.    During 1999, Mike also worked on a recording in the studio for an R&B group working for the Rough Rider record label. I was unaware that he had done this until after the fact. I did not object, however, because I was working from the assumption that when Mike took these many promotional trips, many of which I paid for, that he was promoting the partnership. On those occasions when I was able to make promotional trips, I emphasized the partnership and the individual qualities that Mike I brought to the table. He was the creative genius and I had the technical recording expertise; combined, we had a lot to offer.

15.    By the summer of 1999, our partnership was poised to achieve the success that we had been aiming for since Mike came back to Durham in 1994. The pattern that we established back when I was his manager under the 1989 contract worked. Mike was introduced me in 1988 an enormously talented young man, but the talent was raw. Working together, we refined the talent. I urged him to move away from the harshness of rap to a mellower R&B sound that I thought, and ultimately convinced him, better suited his songwriting and musical talents. We worked together on achieving a certain sound and on getting our operation known in wider music circles. The ultimate goal was to

create a consistently entertaining sound covering many different types of music that drew on talented artists who had no access to studios in New York or LA.

16.     When Mike left for New Jersey and New York in the fall of 1999, I had no reason to think it was a trip any different from several others that he had taken during the five years we worked together after he returned to Durham. I found out later, am informed and believe that he had given a demo tape to a rapper named Tuffy, a member of a rap group called "Channel Live," who in turn gave it to one of the other members of Channel Live, who went by the name of Hawk. Hawk, a friend of Carl Thomas, played the demo and found a number of songs he liked and I am informed and believe that it was he who gave the demo tape to Mr. Thomas. The result is that Mike obtained an opportunity to have some music that we first worked on in Durham recorded by Carl Thomas.

17.     When I first heard from Gerald Drummond, a resident of New Jersey and a member of "Simple Pleasures," that one of Mike's songs was getting air time on radio stations in the New York City area, I was excited. This was exactly the kind of break that we had been waiting and hoping for. Mike communicated with me about this and he acknowledged that he had sold "a couple of songs" to be included on an album by Carl Thomas. He told me during a phone call in January of 2000 that I could expect to get a check from Puffy Combs. After that conversation, most of the contacts between Mike and I were arranged by Eddie Milligan. Those conversations culminated with Mike telling me that we were done, that he wouldn't work with me again, that he didn't need me, and that I never get any money. Although I was shocked to hear those words, I tried to reply calmly and asked Mike to remember how much we had gone through together and all the details of a collaboration that went back from the time of that discussion,

which occurred some time in 2001, and the time that we met in 1988 or 1989. He said none of that mattered and tried to leave it at that.

18.     I declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct and based upon personal knowledge, except for those matters stated on information and belief, and as to those matters, I am informed and believe them to be true.

Executed this the 20th day of January, 2005, Durham, NC

_Eli Brown_

Eli Brown, III

## DECLARATION OF VELVET BROWN

I, Velvet A. Brown, declare and state as follows:

1.      I am the wife of Eli Brown, III, ("Eli") the Plaintiff is this action, and I am well acquainted with the partnership that existed between them.

2.      Mike Flowers ("Flowers") first started working with Eli while Flowers was in school at North Carolina Central University ("Central"). Eli's son, Aaron Speller, was also a student at that time and he introduced Flowers to Eli. Eli worked very closely with Flowers and a vocal group Flowers was involved in at the time, a group called "Choyce." Eli worked very hard to get exposure for the group, even making videos for them and arranging an appearance on local television.

3.      When Flowers finished at Central, he tried to go on his own and left Durham for a time in 1992 or 1993. He was recording at a studio in Miami when a friend of his, Edward Milligan, contacted Eli and said that he, Milligan, thought Flowers could use some support for Eli in Miami. Edward Milligan had also been a member of "Choyce," and eventually Eli went to Miami to see what he could do to help Flowers.

4.      Shortly after Eli's trip to Miami, Flowers came back to Durham and he started working with Eli. Eli had been a manager for Flowers while Flowers was a student, but after he came back to Durham in 1994, he and Eli worked more closely together than before. They talked music constantly at our house, in the studio, at the kitchen table, everywhere. Eli provided recording equipment for Flowers in a studio at our home. Many times Flowers would request that Eli buy a particular item and generally Eli would. I worried about how much time and money Eli was putting into the work with Flowers, but the two of them seemed to work very well together. Eli also funded trips that

Flowers made to music industry shows. Eli assured me that it would all work out when they made it in the business.

5.      From 1994, when Flowers came back to Durham, until 1998 Flowers was at our house daily either working in the studio or talking music with Eli. He had full access to the studio. Sometimes Eli and I would come home from being out and Flowers would be there working in the studio.

6.      The first time they pooled their efforts on behalf of a third party was when they worked at producing a record for "Lost Souls." That began in about 1996 and it was a long, difficult process. They must have worked with "Lost Souls" for two years, at least. They were a rap group and had trouble getting their music out to the public because it was so heavily laced with profanity. It was at that time that Eli and Flowers began talking about heir work together as Hectic Records.

7.      Among the people who were in the studio at our house at that time was Sunshine Anderson. I believe that it was Aaron Speller who introduced Ms. Anderson to Flowers and Eli while she was a student at Central. She came to the house and worked with Eli and Flowers quite a bit. She did a lot of singing for them and I believe recorded some vocals that were used on the "Lost Souls" album and recorded a number of other vocals in the studio at the house as well, including the song that eventually became "Lunch or Dinner."

8.      In addition to purchasing equipment at Mike's request, Eli also brought in people like Daniel Walker and Leslie Blair to help with engineering and other technical aspects of the music. Eli also engaged a man named Gerald Crump to assist with promotion of a second recording project that Eli and Flowers worked on that was called the "North

Carolina Project." Eli funded the recording and promotion of the North Carolina Project, Leslie Blair provided technical and engineering help, and Mr. Crump was to promote the group and the album.

9.      During their discussions about music and the business, Eli and Flowers talked about sharing whatever success they achieved. After "Lost Souls" and the North Carolina Project, they both continued working in the same way that they had before. They both exerted every effort to get into the music industry and talked of splitting the proceeds of any deal that either of them could make. The actual studio time decreased somewhat in 1998 and after because the two of them had already recorded hundreds of demo tapes and tracks and because they had worked together so much that they almost spoke to each other in code about "dropping tracks," or "tweaking the voice level" and technical things of that nature.

10.     When Flowers left Durham again in the fall of 1999, there was nothing to indicate that his trip would be any different from many, many other similar trips he had taken during the course of the partnership. Between Flowers and Eli, one of them was on the road working to land contracts or entice proven acts to come to Durham and record here, so when Flowers went to New Jersey or New York in the fall of 1999, it was not anything out of the ordinary. When Eli learned that Mike had made a deal of some kind with Puffy Combs, he was excited at first because it seemed like all those years of hard work had paid off. Flowers continued to call Eli about once a week for several months after he left. He returned and came to our house for a time in 2000, after he had relocated to California, and he talked to Eli about going out there, but Eli would not leave Durham. After that, the phone calls from Flowers dwindled down to one or two a month up until

the time of what I would call the last phone call, some time in late 2001 or 2002 when Flowers evidently told Eli that Eli would never get anything. I heard Eli's part of that conversation and I would say that he never really got upset, as I would have. Instead he calmly spoke about all the work they had done together, all the time the two of them had put in and all the effort that had been invested in the partnership.

11. I had told Eli early on that he should put his agreement with Flowers in writing, but Eli always said that they were partners, sharing 50-50, so there was no need to put anything in writing. Eventually, after I continued to suggest it and when it looked like "Lost Souls" had some chance to make it in the business, they talked about incorporating and I believe even wrote up and signed an agreement that they would incorporate. As far as I know, the papers required for incorporation were never filed.

12. This situation has always struck me as completely unfair. Flowers and Eli were working as partners from 1994 or 1995 all the way up until Flowers took demos put together right here and used them to get his foot into the recording business. That was exactly what he and Eli had been working toward, and when the opportunity finally arrived, Flowers pushed Eli aside and refused to share with Eli as they had agreed. Flowers had the creative talents, but until he worked with Eli and refined his sound, he was floundering in the music business. Flowers used Eli's resources and funding to make contacts in the business and then cut him out entirely. That is just not fair.

13. I declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct and based upon personal knowledge, except for those matters stated upon information and belief, and as to those matters, I am informed and believe them to be true.

Executed this the 18th day of January, 2005 at _Durham, NC_ .

_Velvet Brown_
Velvet A. Brown

## DECLARATION OF DANIEL WALKER

I, Daniel Walker, declare and state as follows:

1.     I am acquainted with Eli Brown ("Brown") and Michael Flowers ("Flowers"), having worked with them from time to time during the periods of time that the two of them worked together, from about 1988 through 1999.

2.     Initially Flowers was a member of a vocal group called "Choyce," that Brown helped to manage and promote.  Flowers studied music at North Carolina Central University and Brown had a studio in his home that the group used for practice sessions and recording sessions.  Brown was an experienced musician who helped during that initial period from about 1988 through 1993 to help refine Flowers' raw talent.

3.     In 1993, Flowers believed he had advanced sufficiently to handle a recording contract on his own, and he left Durham for Atlanta and began working alone to fulfill a contract with InnerSound records.  That project proved to be too much for Flowers and he returned to Durham in 1994.

4.     Upon his return to Durham, Flowers began working with Brown again. Brown frequently asked me to engineer tracks for Flowers, some of which were on old sixteen track analog tapes until we began using an ADAT machine in 1995.

5.     In addition to my engineering work, I was also employed occasionally to play bass parts for tracks Flowers was working on.

6.     Brown and Flowers put in long hours working together after Flowers returned to Durham in 1994.  They were working together, jointly, each using his talents to move toward the goal they shared, which was success in the music business.

7.     Each of them attempted to promote groups, like "Lost Souls," or single recordings, like the "North Carolina Project," but from being around them and working with them for the long hours they worked at Brown's studio, I knew they were working together toward a common goal. I also knew that they planned to share n whatever success they achieved.

8.     Flowers and Brown worked together closely from the time Flowers returned to Durham in 1994. When they weren't working together at the studio here in Durham, one or the other of them was making a trip to Atlanta, or New York, or Chicago, or LA or some other location striving to get a foot in the door for that chance for their breakthrough.

9.     It was not really unusual at all when Flowers left in the fall of 1999 to make a trip to New York and New Jersey. It was exactly the kind of business-generating trip that one or the other of them had been making for five years.

10.     When I first heard that one of Flowers' songs was getting a lot of air play in the New York City area, I was happy for Brown and Flowers both since I knew that this was just the kind of breakthrough that they had been working as partners to achieve. It was and is still hard for me to believe that Flowers did not and does not acknowledge all that Eli Brown did for him. It is even more surprising to me that Flowers does not acknowledge the contributions Brown made to help him find the sound that had brought Flowers so much success. They were working together to reach that point, and when Flowers got there he just tossed Brown aside.

11.     Later on, when Sunshine Anderson's album hit the charts, all I could do was shake my head when I thought about how many times she had worked with Brown and Flowers

at Brown's studio in Durham, working to find just the right musical sound to suit her vocal talents, and it disgusted me to know that Brown was getting no credit for the help he provided in bringing her and Flowers together and in helping to create the sound that they were cashing in on.

12.    Brown and Flowers were partners in far more than just a couple of projects like "Lost Souls" and the "North Carolina Project."  They were partners looking for that big chance in the music industry and when the fruits of all their labors began to produce success, Flowers threw Brown aside.

13.    I declare under penalty of perjury under the laws of the United State that the foregoing declaration is true and correct and based upon personal knowledge, except for those matters stated upon information belief, and as to those matters, I am informed and believe them to be true.

Executed this _20_ day of January, 2005 at _1:20 pm_ , _Durham NC._

_Daniel Walker_
Daniel Walker
(919) 383-3483 Home #
(919) 451-9731 cell #

## DECLARATION OF LESLEY BLAIR

I, Lesley Blair, declare and state as follows:

1. I am acquainted with Eli Brown ("Brown") and Michael Flowers ("Flowers"), having worked with them from time to time during the periods of time that the two of them worked together, from about 1988 through 1999. I am over the age of eighteen.

2. Initially Flowers was a member of a vocal group called "Choyce," that Brown helped to manage and promote. Flowers studied music at North Carolina Central University and Brown had a studio in his home that the group used for practice sessions and recording sessions. Brown was an experienced musician who helped during that initial period from about 1988 through 1993 to help refine Flowers' raw talent.

3. Some time after he graduated from NC Central, Flowers left Durham and tried to make it on his own in the recording business. I am informed and believe that he had a recording contract with a company trying to establish itself in rap and hip-hop. Apparently his efforts were not all that successful, and he returned to Durham in 1994.

4. When he returned to Durham, Mike was struggling to make a go of it in music, and he got back with Eli Brown at that time. I know from working with both of them that Eli was working to get Mike to think more about the rhythm and blues style than about the rap and hip hop style, and that the two of them worked together almost constantly in those days after Mike came back to Durham. I worked with both of them at Eli's studio, and some times when he couldn't use Eli's equipment for some reason, he would come by my place and ask me to help him, mostly with engineering issues. When I worked with the two of them together, it was a true collaboration. Since he had played jazz sax, Eli

had a pretty good sense for what sounded good. He had a lot of input for Mike on that score.

5. While they never really talked about anything like specific contract terms or any other financial issues like that in my presence, they did make clear to everyone who worked with them that they were partners and that they were working together to make it big in music. There were a lot of people who worked with them in Durham, too. I was just one of the people who helped them with technical issues of engineering.

6. The amount of actual grinding in the studio did gradually reduce over time. All of us who worked with Mike and Eli knew that the two of them were doing a lot of traveling around the country to try to get the music they were making heard, or to impress people with the quality of their production so that they could get a chance to produce national acts in Durham. The first phase that they worked after Mike came back to Durham was working on the sound, to get it shifted from hip hop to more an R&B sound. Once they felt like they had a handle on that, they started working toward getting their music and their production abilities out where people could respond to it.

7. The key is that their work was always about "they." They were working toward common goals, at least until Mike happened to get an "in" with Puffy Combs. Once that happened, Mike ditched everyone in Durham. A lot of us who had worked with him some hoped he would remember us, but Eli had a right to expect it since Eli had done so much to move Mike from raw ability to a refined sound, and since the two were working as partners.

8. I declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct and based upon personal knowledge, except for

those matters stated upon information belief, and as to those matters, I am informed and believe them to be true.

Executed this ___19th___ day of January, 2005 at ___8:43 pm___ .

_Wesley M. Blair_
~~Daniel Walker~~
Wesley M. Blair
919 - 682 - 6869